UNITED STATES DISTRICT COURT          <u>NOT FOR PUBLICATION</u>
EASTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

    – against –

RODNEY MUSCHETTE and MALIEK RAMSEY,       <u>MEMORANDUM & ORDER</u>

                    Defendants.           15-CR-525 (ERK)

_____

KORMAN, *J*.:

Rodney Muschette and Maliek Ramsey move to set aside their 2016 convictions for the retaliation murder of informant Nashwad Johnson. They challenge the sufficiency of the evidence and the prosecution's failure to disclose exculpatory and impeachment evidence under *Brady v. Maryland*, 373 U.S. 83 (1963).

**BACKGROUND**

On January 4, 2009, Nashwad Johnson was found shot dead in a bamboo patch off a Georgia highway. Trial Tr. 74-75. A jury convicted two of his fellow Eight Trey Crips gang members of the killing. The Eight Trey Crips is a Brooklyn-based street gang engaged in drug trafficking and violence, including murder, in furtherance of its criminal enterprise. According to prosecutors, Rodney Muschette murdered Johnson on New Year's Eve at the direction of Maliek Ramsey in retaliation for cooperating against gang leader Larry Pagett. The prosecution's case was supported by compelling circumstantial evidence creating strong inferences of defendants' guilt, and the testimony of a cooperating witness confirmed what the circumstantial evidence suggested.

## I.     The Murder

Anthony Braithwaite, also a member of the Eight Trey Crips, began dealing drugs and committing robberies with defendants Muschette and Ramsey around September 2007. Trial Tr. 219, 247, 249, 295, 297-301. In March or April of 2008, Braithwaite overheard defendants

1

discussing how Johnson may have been cooperating against Eight Trey Crips leader Larry Pagett. *Id.* at 309. But according to Braithwaite, defendants refused to believe Johnson was cooperating based on Pagett's word—they needed documentary proof. *See id.* at 309-11.

The prosecution theorized that defendants got that proof after Pagett's sentencing. In a letter dated December 23, 2008, prosecutors confirmed that "several members of [Pagett's] gang agreed to cooperate," including a witness referred to as "CW1." GX 428(a) at 3.[1] In open court, on December 30, 2008, Pagett stated that he believed Johnson was the cooperator. GX 428(b) at 32-33 ("The government stated themselves in their response to the defense's sentence memorandum that [Nashwad] Johnson, *who is the cooperating witness*[,] was one of a few [Eight Trey] members that chose to proffer . . . ." (emphasis added)). The same day, after the sentencing, Pagett's sister Tanya called Ramsey, who was living in London. Trial Tr. 909-10, 1131; GX 430. According to a recorded call between Tanya and Larry Pagett the same day, Tanya confirmed that she heard Larry's in-court statement about Johnson's cooperation and discussed it with Ramsey, who was upset to hear the news. GX 221(a)-(b) (calls between Larry and Tanya Pagett on 12/30/2008 referencing Larry Pagett's in-court identification of Johnson as the cooperator and discussing that Ramsey, referred to by his nickname "Squingey," was crying in reaction to this confirmation).

It was then, according to the prosecution, that Ramsey began to plan Johnson's murder. On December 30, immediately after speaking with Pagett's sister, Ramsey called Muschette, who was in Atlanta, Georgia, and the two spoke for ten minutes. GX 255; Trial Tr. 834-35, 910. Ramsey and Muschette spoke multiple times that day, including a call lasting about five minutes. GX 255. The next day, on New Year's Eve, Ramsey called Muschette at 5:00 PM Atlanta time, and the two

---

[1] The notation "GX" refers to the government's trial exhibits.

spoke for twenty minutes. GX 256; Trial Tr. 915. Ramsey also spoke for four minutes with an individual named Marlon Cole or "Nut," a member of a different set of Crips called the G Stone Crips. GX 255; *see* Trial Tr. 340, 890, 895, 925; *see also* GX 454 (matching users with telephone numbers).

On December 31, 2008, Braithwaite, Johnson, Muschette, and two other associates were hanging out at an apartment in Atlanta in advance of their planned New Year's festivities. Trial Tr. 339. Cell site records confirm Muschette was at the apartment at around 11:15 PM. GX 278, 406; Trial Tr. 338, 838. Two cars left the apartment for a club. Trial Tr. 340. Muschette drove with Johnson in the passenger seat in one car, and Braithwaite traveled in another car. *Id.* Along the way, around 11:30 or 11:45 PM, they met up with Nut in a shopping center parking lot and followed his car toward their destination. *Id.* at 340-41.

Nut's car led the way, followed by the car containing Muschette and Johnson, with Braithwaite's car bringing up the rear. *Id.* at 341-42. The caravan got back on the highway. *Id.* at 342. Braithwaite saw the lead car swerve and then pull over to the right-side shoulder of the highway. *Id.* Muschette pulled over behind him. *Id.* At the side of the highway there was a "slanted slope" leading to a wooded area. *Id.* at 350. Johnson jumped out of the second car, ran toward the last car in the caravan, and jumped over the guardrail. *Id.* at 343. Muschette chased after him and opened fire. *Id.* Braithwaite's car then pulled back onto the highway and headed back to the apartment where the men were staying. *Id.* at 344.

At approximately 11:50 PM, cell site data put Muschette one mile from where Johnson's body was eventually discovered. GX 279; Trial Tr. 77. And defendants' telephone contact spiked around the time of the murder. *See* GX 261(b), 262(b). Beginning at 11:51 PM on December 31, 2008 (4:51 AM London time) until 12:33 AM (5:33 AM London time) on January 1, 2019,

Muschette placed several calls attempting to reach Ramsey. GX 256. At 12:33 AM, Ramsey answered a call from Muschette, which lasted about a minute and a half. *Id.* Shortly thereafter, Braithwaite got word that "[Johnson] went to . . . heaven," which he took to mean that Johnson was dead. Trial Tr. 344-45. Muschette also spoke to Braithwaite and said, "Shit is real out here. Shit real in the field. This is our year. We ain't making no more mistakes." *Id.* at 345. Cell phone records confirm a call between Brathwaite and Muschette shortly after midnight on January 1, 2009. *See* GX 256; GX 454. Significantly, while this evidence undoubtedly placed Muschette in Atlanta, at the time of his arrest he denied that he had "traveled to Atlanta around the time of [Johnson's] death." Trial Tr. 1217.

Subsequently, Muschette described to Braithwaite in detail how he murdered Johnson. His story was entirely consistent with the circumstantial evidence, which demonstrated (1) Muschette's presence near the location where Johnson's body was found and (2) Muschette's constant communication with Ramsey immediately before and after the murder. First, Muschette confirmed that he had definitively learned that Johnson was cooperating against Pagett via "paperwork" that "was sent to his phone." Trial Tr. 347. At that point, Muschette had "seen it in black and white that [Johnson] snitched on [Pagett]" and "he had to take care of it." *Id.* Muschette also told Braithwaite that he confronted Johnson about his cooperation on the day of the murder. Muschette told Johnson, "You broke my heart. . . . I brought you into the scene. This is how you repay me." *Id.* When Muschette reached for his gun, Johnson punched Muschette in the face and jumped out of the car before Muschette gunned him down. *Id.* at 347-48. Muschette had chased Johnson into the wooded area near the highway, and, seeing Johnson had been shot, "finished the job." *Id.* at 348.

According to the medical examiner, Johnson died of "multiple gunshot wounds [to] the torso." *Id.* at 103. In total, "[t]here were 11 gunshot tracks in the body," including "five gunshot wounds that entered his back and exited through the front of the body" and "several that went through his left arm and . . . others that went through the shoulder and the chest." *Id.* Specifically, in addition to the five gunshot wounds to the back, Johnson sustained two gunshot wounds that entered his chest from the front of the body (one passed through the skin only and the other through the pectoral muscle; both exited through the chest), one gunshot wound that entered at the apex of the shoulder, one gunshot wound to the left wrist, and two gunshot wounds to the posterior left arm (between the elbow and shoulder, in the rear). *See* GX 415. At the time of the autopsy on January 5, 2009, "lividity had already become fixed," meaning "that at least 8 to 20 hours had passed since he died," and maximal rigor had set in. *Id.* at 114-16. The medical examiner explained that "generally, . . . rigor . . . form[s] over the space of roughly 12 hours. It will stay maximal for about 12 hours, and then as the proteins start to break down, it goes away over the next 12 hours." Trial Tr. 116. This timeline is "variable based on the circumstances, and the temperature, and the conditions at the time." *Id.* The process slows in a cooler environment and speeds up in a warmer environment. *Id.* In addition, decomposition had just begun. *Id.* at 117. Taking these factors into account, the medical examiner concluded that Johnson "had been dead for at least a day, but as far as how many more days, [she] couldn't be precise." *Id.* Even so, she was "familiar with individuals for whom rigor ha[d] stayed present . . . when they'd been left in colder environments." *Id.* at 118. Notably, temperatures were below freezing on New Year's Eve and remained in the 30s and 40s until January 3. *Id.* at 1180-81; GX 446.

Braithwaite also connected defendant Ramsey to the murder. A little more than a year after the murder, Braithwaite was arrested and pleaded guilty to multiple drug- and gun-related crimes.

Trial Tr. 353-54. He was taken into federal custody in February of 2010. *Id.* at 353. In April 2012, Ramsey visited Braithwaite in prison. *Id.* at 355; GX 440 (visitation record indicating visit by Ramsey on April 20, 2012). When Braithwaite asked about the Johnson murder, Ramsey said, "I love [Johnson], but he [was] told. . . . [I]t had to happen. Had to go down like that. He had to [g]et pushed. . . . [N]ow don't get it twisted. It ain't like [Muschette] went on and did it. *I'm the one who ma[d]e sure it got done*." Trial Tr. at 355-56 (emphasis added). And "if [Muschette didn't] take care of it, I was going to make [another gang member] take care of [Muschette] and [Johnson] also." *Id.* at 356.

## II.    Testimony of Godfrey Grant

Godfrey Grant, another member of the Eight Trey Crips, also took the stand for the prosecution to explain the history of Johnson's cooperation and the gang's awareness of it. *See id.* at 1710-15 (prosecutor's summation addressing Grant's testimony). Grant thought that Johnson might have been cooperating against Pagett as of late 2006. *Id.* at 633-35. At that point, Grant told Johnson to stop cooperating, after which Johnson showed up at one of Pagett's court appearances to express his support. *Id.* at 636-37, 662. In an October 2, 2006 recorded telephone call, Pagett told Grant that Johnson would have to "fix what he broke" and that he was "steaming" over Johnson's cooperation. *Id.* at 685-86. Nevertheless, Pagett declined Grant's offer to take violent action against Johnson. *Id.* at 759; GX 201. Also around that time, Ramsey asked Johnson about his cooperation in Grant's presence, at which point Johnson said he had already talked about it with Grant. Trial Tr. 646. Grant testified that he did not necessarily know for sure that Johnson was cooperating at the time of these events; he "gave him the benefit of the doubt." *Id.* at 647.

That changed in May 2007, when Grant was arrested and charged with obstruction of justice for confronting Johnson about his cooperation. *Id.* at 647. He was also charged with being

a felon in possession of a weapon, for which he pleaded guilty and was sentenced to 30 months' imprisonment. *Id.* at 647-48. While in prison, Grant sent a letter to a friend that he hoped would get to Ramsey, expressing his displeasure that no action had been taken against Johnson. *Id.* at 655-56. Grant was released from prison in 2009 after Johnson's murder but was later charged with additional crimes stemming from a separate attempted murder in 2015. *Id.* at 658, 662-64. He entered into a cooperation agreement with the government in exchange for a potentially reduced sentence. *Id.* at 664-65.

In a recorded phone call played at trial, Grant stated that Johnson was "just talking too much" and he was "getting tired of that shit." *Id.* at 691. Grant also admitted that he had wanted to "punch [Johnson] in the head" and that "Pagett was worried about [Johnson] cooperating." *Id.* at 691-97. In Grant's view, Ramsey was "standing up for [Johnson]" at the time. *Id.* at 697. At one point in 2007, Pagett's roommate told Grant to put out a hit on Johnson, a request Grant did not execute. *Id.* at 698. While defense counsel stopped short of accusing Grant of orchestrating Johnson's murder, the following exchange ensued:

> Q: And you suspect that [Johnson] was a cooperator, right?
>
> A: Yeah, I suspected it.
>
> Q: And you don't take any nonsense from anybody, right?
>
> A: No, I don't.
>
> Q: Somebody shoots at your door, you blow them away if you can, right?
>
> A: Yeah.

*Id.* at 717. Significantly, in two rap videos, which were not themselves offered into evidence, Grant references Johnson's "snitching" and takes responsibility for orchestrating his murder.[2]

---

[2] The video for the song "Financial Freedom" appears at https://www.youtube.com/watch?v=VAP9ZlZjOMU&pbjreload=10, and the video for the song "Lean Wit It" appears at https://www.youtube.com/watch?v=tsx1FniyWWE&pbjreload=10.

Surprisingly, particularly in light of defendants' argument here that they had no basis at the time to question Grant about his involvement in the murder, defendants did not attempt to cross Grant with the lyrics of the songs or offer the videos into evidence. *See* Trial Tr. 667-68. Rather, defendants only attempted to play "[a] minute" of the rap videos "to show the relationship between [Grant] and Mr. Pagett." *Id.* at 670-71. Because Grant admitted that Pagett appeared on the videos with him, I found it unnecessary to play the videos to demonstrate that relationship. *See id.* Nevertheless defendants did not even attempt to cross-examine Grant using the lyrics or seek admission of the videos to show that Grant confessed to the murder. *See id.*

During closing argument, defense counsel posited that "[Grant] hates Maliek Ramsey" and the "testimony by [Grant] against Mr. Ramsey is designed to help him with his own problems." *Id.* at 1785. Yet Grant's testimony was largely limited to background information about the Eight Trey Crips and the gang's knowledge of Johnson's cooperation to support the prosecution's theory that Ramsey and Muschette did not fully believe Johnson was cooperating until Pagett's in-court statement. Grant never implicated either of the defendants in the murder. On the contrary, Grant testified that he was upset with Ramsey for not acting against Johnson sooner and sent him a letter to that effect, as explained above. *Id.* at 655-56, 691-94.

## III.    The Alleged *Brady* Material

Prior to trial, defendants requested "the jail calls for all of the cooperators" to determine if "the cooperating witnesses were talking about [the murder] on the phone from jail." 6/29/16 Tr. 25, ECF No. 164; 9/20/16 Tr. 29, ECF No. 75. At a status conference before the magistrate, the prosecution indicated that it was "prepared to turn over the recorded telephone calls of its cooperating witnesses[] that are currently in its possession" but that it did not "have calls in the . . . four months before or four months after the murder" because the Bureau of Prisons only retained

calls for six months. 9/20/16 Tr. 7, 13, 17, 35. The magistrate "ask[ed] the prosecution to confirm their representation in writing after consulting with the appropriate prison authorities." *Id.* at 28.

In a letter dated September 28, 2016, the prosecution confirmed that it "ha[d] consulted with the Bureau of Prisons ('BOP'), where certain of the government's witnesses have previously been housed, and the BOP has advised that it retains recorded telephone calls for a period of only six months." 9/28/16 Ltr. 1, ECF No. 71. The letter further represented that "the government has now provided to defense counsel all of the recorded telephone calls in the government's possession for the witnesses it intends to call at trial." *Id.* at 1-2. At a subsequent conference, the prosecution stated, "The government has now provided to the defense[] all of the recorded telephone calls that are currently in its possession," meaning that it had "provided all of the recorded telephone calls . . . that the United States Attorney's Office has in its possession." 9/29/16 Tr. 3, ECF No. 165.

Nevertheless, the prosecution notified defendants after trial that it located more than 400 recordings of calls made by Grant while incarcerated in 2008 and 2009. 2/10/17 Ltr., ECF No. 185. Another prosecutor in the U.S. Attorney's Office for the Eastern District of New York had requested the calls "in connection with another case," and the Bureau of Prisons retained them. *Id.* at 1. But the recordings "were not maintained in any of the files . . . connected to the investigation into the murder of Nashwad Johnson." *Id.* at 1 & n.1. The prosecution provided the calls "to defense counsel . . . in light of its prior representation to the Court and to counsel that the government did not possess these telephone calls." *Id.* at 2. Defendants now rely on about a dozen of the 400 calls to weave a theory that Grant ordered Johnson's murder.

## DISCUSSION

Defendants move for a judgment of acquittal under Federal Rule of Criminal Procedure 29 on the basis that "the evidence is insufficient to sustain a conviction." Alternatively, defendants move for a new trial under Federal Rule of Criminal Procedure 33, on the basis that the jury's

verdict was against the weight of the evidence and the prosecution failed to disclose exculpatory and impeachment evidence as required by *Brady*.

## I.     Sufficient Evidence Supported the Verdict

Defendants argue that the evidence was insufficient to convict them for two reasons. First, they claim that the prosecution's alleged motive for the murder is unreasonable. Second, they claim that the testimony of the prosecution's key witness was incredible and contradicted by other evidence. I disagree on both counts.

### A.     Legal Standard

On defendant's motion, "the court . . . must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). "In challenging the jury's verdict, a Rule 29 movant 'bears a heavy burden.'" *United States v. Klein*, 913 F.3d 73, 78 (2d Cir. 2019) (quoting *United States v. Martoma*, 894 F.3d 64, 72 (2d Cir. 2017)). The court "must view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence." *Martoma*, 894 F.3d at 72 (quoting *United States v. Coplan*, 703 F.3d 46, 62 (2d Cir. 2012)). The conviction must stand "if '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Reifler*, 446 F.3d 65, 94-95 (2d Cir. 2006) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "In a close case, where 'either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, [the court] must let the jury decide the matter.'" *Klein*, 913 F.3d at 78 (quoting *United States v. Autuori*, 212 F.3d 105, 114 (2d Cir. 2000)).

At trial, the prosecution argued that Ramsey enlisted Muschette to murder Johnson when Ramsey found out that Johnson was an informant against Larry Pagett, the leader of the Brooklyn Eight Trey Crips. Pagett revealed this fact on the record at his sentencing on December 30, 2008. In a recorded telephone call that same day, Tanya Pagett told her brother Larry that she informed Ramsey about this in-court statement. According to the prosecution, Ramsey then ordered Muschette to kill Johnson. The problem with this theory, according to defendants, is that the fact of Johnson's cooperation was well known before December 2008. For example, Grant, another gang member, knew that Johnson and Pagett had been housed separately at the Metropolitan Detention Center in April 2006, which Grant took to mean that Johnson might have been cooperating against Pagett. Trial Tr. 622-27. And Pagett and Grant were subsequently arrested for obstruction of justice when they tried to stop Johnson from cooperating in 2007. *Id.* at 647, 716-17. For these reasons, defendants assert that it "defies belief that the catalyst for the murder was based on [Pagett]'s sentencing remarks on December 30, 2008," because the fact of Johnson's cooperation "could have [been] communicated . . ., with the paperwork to prove it, to any number of cohorts" beforehand. Opening Br. 7, ECF No. 171. Moreover, defendants claim that Pagett had no incentive to retaliate against Johnson after Pagett was sentenced because Johnson would not later be called as a witness. *Id.* at 8.

The argument that defendants lacked a motive to kill Johnson was readily available to defense counsel at trial. Indeed, defense counsel made these very arguments to the jury. *See* Trial Tr. 1786-90. The jury was nonetheless entitled to credit the prosecution's theory that the information gleaned from Pagett's sentencing confirmed Johnson was cooperating with prosecutors and inspired the murder. Both Braithwaite and Grant testified that fellow gang

members believed Johnson had stopped cooperating. According to Braithwaite, that all changed once Ramsey received word that Pagett named Johnson as a cooperator in open court and Muschette received paperwork confirming Johnson's cooperation. This theory was reasonable considering the timeline of events established at trial, which was supported by telephone records, recordings, and cell site location data. It also comports with the abundant evidence of the Eight Trey Crips' self-proclaimed penalty for snitching: death. Indeed, in a 2012 tweet, Ramsey deemed himself a "Certified Rat Killer." GX 432(h). He also opined that "rats" deserve "bullets," GX 432(i), should be dropped from a roof (and go "splat"), GX 432(j), and, more generally, "Die snitch . . . die!!!" GX 432(k). Likewise, some years after Johnson's murder, Pagett had his torso tattooed with a large, dead rat hanging from a noose under the word "FEDS" crossed out with an "X," next to a stop-sign bearing the words "STOP SNITCHIN." *See* GX 422(a). Above the noose is the number "187"—a reference to murder. *See id.*; Trial Tr. 1045.

C.     *A Reasonable Jury Could Credit Braithwaite's Testimony*

Defendants' challenge to Braithwaite's testimony fares no better. First, defendants argue that the murder, as described by the prosecution, was poorly planned and carried out in public. *See* Opening Br. 10 ("As a matter of common sense, a premediated murder would be carried out in a secluded spot, with as few witnesses as possible."). Yet the prosecution's theory of the murder— that Johnson was shot in a wooded area near the side of a highway in the middle of the night— hardly describes a crime carried out in the open and in full view of the public. Indeed, as poorly planned as defendants suggest the murder was, it took law enforcement seven years to solve.

Next, defendants contend that the caravan's path, as described by Braithwaite, was not possible. According to defendants, the caravan must have been proceeding north because the wooded area where the shooting occurred was on the northbound side of the highway. *See* GX

109. And the apartment from which the original two cars left was north of the murder scene, meaning that they must have proceeded south. *See* Trial Tr. 77, 338-40, 1743, 1752-53; GX 109. Even so, nothing in the record requires that the two cars maintained one path south. For example, all three cars may have met up south of the murder scene before proceeding north. Defendants assert that this theory is implausible because the friend with whom Muschette allegedly met up also lived north of the murder scene and it would not make sense for everyone to drive south to meet before heading north. *See* GX 109. But there was no evidence that the friend traveled from his residence. Moreover, cell site data placed Muschette near the apartment where he was hanging out before leaving for the club at around 11:15 PM and just north of the murder scene after the time of the alleged shooting, consistent with the prosecution's theory. *See* GX 278. And Braithwaite's description of the highway where the cars pulled over, next to a guardrail and slanted slope which led down to a wooded area, is consistent with the murder scene. *See* GX 100(e), 104(b).

Defendants also insist that the alleged path of the caravan is inconsistent with the timeline described by Braithwaite. However, Braithwaite did not testify to the precise amount of time that passed between leaving the apartment and the murder. Rather, he explained that he drove "a couple of minutes" before meeting up with his friend around 11:30 or 11:45 PM at a shopping center parking lot and then a "couple of minutes" more before the cars pulled over and Muschette shot Johnson. Trial Tr. 340-43. Braithwaite's lack of specificity is not plainly inconsistent with the prosecution's theory, and it is understandable that a witness testifying about events that occurred several years earlier might misremember minor details. Regardless, there was overwhelming proof that Muschette was in Atlanta—a fact which Muschette denied to law enforcement—and at or near

the scene of the murder. *See* Trial Tr. 1217; Reply Br. 22 n.9, ECF No. 176 (conceding that jury could have relied on this lie as consciousness of guilt).

Defendants also contend that Braithwaite's testimony that Johnson was murdered on New Year's Eve is irreconcilable with the medical examiner's testimony and that he must have been murdered after Muschette left Atlanta on January 2, 2009. This argument centers on the fact that at the time of the autopsy on January 5, 2009, Johnson's corpse was in maximal rigor. Based on this observation, the medical examiner concluded that Johnson "had been dead for at least a day," prior to the autopsy, "but as far as how many more days, [she] couldn't be precise." Trial Tr. 117-18. Indeed, the medical examiner indicated on the death certificate that she believed Johnson died on January 4. Trial Tr. 143-44.

At the same time, the medical examiner was "familiar with individuals for whom rigor ha[d] stayed present . . . when they'd been left in colder environments." *Id.* at 118. When asked by defense counsel whether the 50- and 60-degree temperatures "would . . . be the kind of temperature that would . . . slow the [relevant decomposition] process[es]," the medical examiner responded, "It has the potential to slow the process, yes." *Id.* at 146-47. The medical examiner emphasized that her estimate was that Johnson had been dead for "*at least*" one day. *Id.* at 133 (emphasis added). Indeed, it is undisputed that Johnson was in fact dead longer than one day because his body was seen at 10:30 or 11:00 AM on January 3. Trial Tr. 48-52.

Although defense counsel posited at trial that "in the 48 hours before [the medical examiner] got the body the temperature [in Atlanta] was in the 50s and 60s," *id.* at 146, the climate reports received into evidence tell a different story. Buried in a footnote in defendants' opening brief is the fact that temperatures were below freezing in the early hours of January 1 and reached a high of only 46 degrees. Opening Br. 17 n.5; Trial Tr. 1180-81; GX 446. On January 2,

temperatures ranged from 39 degrees to 45 degrees, and on January 3, the morning on which Johnson's lifeless body was first noticed, temperatures ranged from 45 degrees to 57 degrees. Trial Tr. 1180-81. Temperatures then remained in the mid-50s until the body was recovered. GX 446. This clearly suggests that the relatively cold weather in the days immediately following the shooting slowed the process of rigor mortis and, ultimately, decomposition. Defendants make no effort to address the significance of the colder temperatures and merely grumble that the weather data was introduced through another witness later in the trial. Opening Br. 17 n.5. Nevertheless, the jury grasped the significance of the weather data, which it requested during deliberations, Trial Tr. 1929, and did not unreasonably rely on the uncontroverted expert opinion that colder temperatures could have slowed rigor mortis, consistent with the prosecution's theory that Johnson was shot around midnight on New Year's Eve. While defense counsel had requested and received both expert and investigative services over the course of this case, they did not seek permission to employ a forensic medical expert who would have contradicted the prosecution's theory. And again, uncontroverted circumstantial evidence established that the murder took place on New Year's Eve.

Defendants' final argument based on the physical evidence is that the ballistics are inconsistent with the prosecution's theory of the case. Specifically, defendants claim that (1) "five shell casings and a bullet[] were all found some distance from, and behind, the body," inconsistent with Johnson being shot at close range, or "finished off" as Braithwaite testified; (2) the absence of stippling is inconsistent with shots being fired at close range; and (3) the entrance wounds "were inconsistent with 'finishing' shot(s) being fired as Johnson looked up at his killer." Opening Br. 23-24. At oral argument, defendants also emphasized that most of the shell casings were not located near the highway. They claim this is inconsistent with Braithwaite's testimony that

Muschette fired shots at Johnson as he ran from the highway toward the wooded area. *See* 6/17/19 Tr. 10-11.

None of these arguments has merit. Braithwaite never claimed to observe every detail of the shooting; rather, he testified that he saw Johnson "hop out [of] the car, . . . [and] jump[] over the guardrail" before Muschette "chas[ed] after him" and what looked like "flames [came] from [Muschette's] hand." Trial Tr. 343. Johnson was running for his life, and there is no evidence regarding the precise path of the chase. It is true that Muschette allegedly told Braithwaite that he "went [in]to the woods area" after Johnson, who "looked like he was hit up" and was "slumped," before he "finished the job." *Id.* at 348. And the fact that Johnson was slumped over at the time of his death is confirmed by the crime scene photos. *See* GX 101(b). Yet there is no evidence suggesting that Muschette "finished the job" by shooting Johnson at point-blank range in a specific part of the body. Nor does the presence of five shell casings near the body necessarily mean that Johnson was not shot as he ran from the highway. Only five shell casings were recovered while Johnson sustained eleven separate gunshot wounds, meaning that six of the shell casings were simply not recovered. *See* GX 415. In all, the ballistics evidence does not undermine Braithwaite's testimony. Indeed, defense counsel did not find it necessary to focus on the location of the shell casings in their cross-examination of the ballistics expert, *see* Trial Tr. 212-18, or the nature of the gunshot wounds during their cross-examination of the medical examiner, *see id.* at 119-49, or to discuss the ballistics evidence at all during summations, *see id.* at 1764-1841. In fact, defendants argued at trial that the shell casings may have been moved around by rain or wind. *See* Trial Tr. 89-90.

Defendants' remaining arguments regarding the sufficiency of the evidence amount to a claim that Braithwaite was simply not credible and had a motive to lie. To be sure, defense counsel

ably crossed Braithwaite and pointed out several alleged inconsistencies or factual errors in his testimony (which might be expected of a witness testifying more than seven years after the murder). *See, e.g.*, Trial Tr. 373-88. But evaluating a witness's credibility is squarely within the purview of the jury. *See United States v. Chavez*, 549 F.3d 119, 124-25 (2d Cir. 2008).

In sum, after drawing all reasonable inferences in the government's favor and deferring to the jury's credibility assessments, *id.*, I cannot conclude "the evidence that the defendant[s] committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt," *Martoma*, 894 F.3d at 72 (quoting *United States v. Jiau*, 734 F.3d 147, 152 (2d Cir. 2013)). Indeed, I agree with the jury's verdict in this case and find the evidence against defendants compelling. Accordingly, I deny defendants' motion for a judgment of acquittal.

## II. The Verdict Was Not Against the Weight of the Evidence

Alternatively, defendants ask me to set aside the verdict and grant a new trial because the jury's verdict was against the weight of the evidence. *See* Fed. R. Crim. P. 33. "In considering whether to grant a new trial [under Rule 33], a district court may itself weigh the evidence and the credibility of the witnesses, but in doing so, it must be careful not to usurp the role of the jury." *United States v. Canova*, 412 F.3d 331, 348-49 (2d Cir. 2005). "The ultimate test is whether letting a guilty verdict stand would be a manifest injustice. There must be a real concern that an innocent person may have been convicted." *Id.* at 349 (quotation marks and ellipsis omitted).

The verdict was not against the weight of the evidence. Significantly, the case did not turn solely on Braithwaite's testimony; substantial evidence corroborated his story. The timeline of the murder itself is compelling evidence of defendants' guilt. Just after Pagett named Johnson as the cooperator in open court, Ramsey and Muschette had a series of phone calls. Cell site data placed

Muschette in Atlanta the day of the shooting and near the crime scene at the time of the shooting. This series of events, when viewed in conjunction with Braithwaite's testimony, provided overwhelming evidence of the defendants' guilt. Indeed, the jury also appears to have focused on the cell phone records, telephone recordings, and cell site data, having requested to review that evidence during deliberations. *See* Trial Tr. 1929, 1955, 1958, 1974. The motion for a new trial on the ground that the jury's verdict was against the weight of the evidence is denied.

## III.  The Post-Trial Disclosure of Grant's Calls Do Not Warrant a New Trial Under *Brady*

Defendants also move for a new trial based on the prosecution's post-verdict disclosure of Godfrey Grant's recorded jail calls, which allegedly implicate Grant in the murder. "[T]he suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. To establish a *Brady* violation, "[t]he evidence at issue must be favorable to the accused, . . . evidence must have been suppressed by the State, . . . and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). Because the calls were not suppressed and are cumulative, immaterial, or both, defendants' claim fails.

### A.  The Calls Were Not Suppressed Because the Defendants Knew the Essential Facts Contained Therein

I first address whether the calls were suppressed by the prosecution. "Evidence is not 'suppressed' if the defendant either knew, . . . or should have known, . . . of the essential facts permitting him to take advantage of any exculpatory evidence." *United States v. LeRoy*, 687 F.2d 610, 618 (2d Cir. 1982); *see also United States v. Diaz*, 922 F.2d 998, 1007 (2d Cir. 1990) ("[T]here is no improper suppression within the meaning of *Brady* where the facts are already known by the defendant."). And if the defendant should have known facts that "may have

warranted some additional investigation," that information is not suppressed. *United States v. Zackson*, 6 F.3d 911, 919 (2d Cir. 1993).

According to defendants, the newly disclosed calls establish the following:

- "The calls . . . supplied a basis to question Grant about two rap songs he wrote, referencing Johnson as a snitch and rat, and suggesting Grant's participation in orchestrating the murder."

- "[T]he calls show that in 2008, Grant continued to believe that Johnson was cooperating and that he was contemptuous of the Church Avenue Crips who he thought were weak."

- "[T]he calls reveal a previously undisclosed relationship between Grant and Side Bike, the [leader] of another Brooklyn set, the G Stone Crips, and the relaying of secret messages between the two men . . . ."

- The "calls reveal a rift between Pagett and Grant after Johnson was killed," regarding something Grand did with Side Bike, "consistent with Grant green-lighting the murder without Pagett's permission."

Reply Br. 27-28.

Defendants had ample evidence of the "essential facts" contained in the calls prior to trial.

First, defendants had Grant's rap videos, which implicated him in the murder, as well as Grant's album cover featuring a picture of a rat dangling from a noose. *See* GX 412(a). Grant's rap song "Financial Freedom" begins as follows:

> [T]his is not a fictional tale, this shit real. . . . This one shootout, Biz [Pagett] was headed back to prison. Nash [Johnson] running round the town, proud like he wasn't snitching. (Rat!) Pushing the package is what we practiced. Touch one of mine, and it's a fact, I react like a savage. Either you get down or lay down, them llamas gone pop. . . . Believe me, violate and get Xed out.

The song "Lean Wit It" contains the following:

> Heard about . . . Nash? Should have seen this Crip face! Jury asked who it was, . . . tell 'em Crill Gates [Grant]. Damn, I had the strap in my pocket 90-shot Mac in my pocket. I'm throwing bullets faster than a rocket. . . . Your little homies with me, they ain't got no damn

sense. They makin' movies but it's me who wrote the whole script.[3]

In short, defendants already had Grant confessing on video to his involvement in the murder, which they did not use during trial. Moreover, defendants already knew that Grant believed Johnson to be cooperating as of 2008; Grant testified that the 2007 obstruction of justice complaint filed against him confirmed to him that Johnson was cooperating. Trial Tr. 647.

Defendants also had ample evidence connecting Grant to the G Stone Crips and its leader, Side Bike, who defendants allege conspired with Grant to kill Johnson. First, defendants knew that Side Bike was incarcerated at the time of the murder and was the leader of the G Stone Crips. Opening Br. 37 (citing Section 3500 material). Second, defendants knew that a man nicknamed "Nosey," along with another man nicknamed "Bean," drove Johnson to Atlanta prior to the murder. *Id.* at 38 (citing a 6/7/2016 "*Brady* letter" for this fact). Third, defendants knew that Nosey was a member of the G Stone Crips.[4] *Id.* at 37. Fourth, defendants knew that Nut—another member of the G Stone Crips—drove the lead car in the caravan that brought Johnson to the scene of his death. Trial Tr. 341-42. Fifth, defendants knew that Grant was dating Side Bike's sister, establishing a connection between Grant and Side Bike. Opening Br. 37 (citing Section 3500 material). And

---

[3] The rap videos are located at the links cited in footnote 1, *supra*.

[4] Defense counsel maintained at oral argument that "we didn't know who Nosey and Bean were and we didn't know of their relationship to Side Bike." 6/17/2019 Tr. 25. This contention is directly contradicted in part by defendants' opening brief, which concedes knowledge of Nosey's affiliation with the G Stone Crips, citing Section 3500 material produced before trial. Opening Br. 37. And "Bean," who was identified by the prosecution as Kemar Gayle in the same pre-trial *Brady* disclosure referenced above, had a publicly available arrest and incarceration record at the time of trial indicating likely gang affiliations, which can be located through a simple Internet search. *See, e.g.*, Dep't of Corr. & Cmty. Supervision, Inmate Information, http://nysdoccslookup.doccs.ny.gov/GCA00P00/WIQ3/WINQ130 (Search "Kemar Gayle") (last visited July 23, 2019). Information contained in public records is not suppressed where "defense counsel should know of [the records] and fails to obtain them because of lack of diligence in his [or her] own investigation." *United States v. Payne*, 63 F.3d 1200, 1208 (2d Cir. 1995). It is also unclear whether by stating "we didn't know," defense counsel also represents that their clients did not know who Nosey and Bean were prior to trial, which is dubious.

sixth, defendants knew Grant had means of communicating with other prisoners. *See* Trial Tr. 648-49, 706.

Paired with the contents of the rap videos, defendants "had sufficient access to the essential facts enabling [them] to take advantage of any exculpatory material that may have been available." *See Zackson*, 6 F.3d at 919. As defendants put it, "it is Nosey's link to Side Bike and the G Stone Crips that makes the secret messages between Grant and Side Bike, revealed in the withheld jail calls, particularly noteworthy." Reply Br. 30 (emphasis omitted). But defendants already had evidence of these links. For that reason, defendants' contention that "because the defense did not have Grant's telephone recordings . . . until after the trial, we were not able to make the critical connection between Grant and Side Bike and Nosey" is nonsense. *See* 7/8/2019 Ltr. 3 n.2, ECF No. 188. The only remaining facts in the calls about which defendants arguably did not know is that Pagett was angry with Grant for some reason. As explained in the following section, that evidence is speculative and immaterial.

Because the essential facts in the calls were not "unknown to the defense," *United States v. Agurs*, 427 U.S. 97, 103 (1976), I need not resolve the prosecution's alternate argument that it never possessed the calls for *Brady* purposes because the prosecutors here were unaware that the evidence was requested by different prosecutors in the same office in an unrelated case.[5]

---

[5] The answer to this fact-intensive question appears unsettled. *Compare Giglio v. United States*, 405 U.S. 150, 154 (1972) ("The prosecutor's office is an entity and as such it is the spokesman for the Government. A promise made by one attorney must be attributed, for these purposes, to the Government."), *with United States v. Avellino*, 136 F.3d 249, 256 (2d Cir. 1998) (fact that the evidence was in the physical possession of the U.S. Attorney's Office did not resolve the question of actual or constructive knowledge) *and United States v. Volpe*, 42 F. Supp. 2d 204, 221 (E.D.N.Y. 1999) ("Where the two prosecution teams within the United States Attorney's office are not involved in a joint investigation, and where the prosecution does not have access to the material requested, the 'government' is not required to produce the requested material.").

B.     *The Calls Are Not Material Evidence Favorable to Defendants*

Even assuming that defendants were not aware of the essential facts contained in the calls, they do not constitute material evidence favorable to the defendants. "Evidence is favorable if it is either exculpatory or impeaching." *United States v. Triumph Capital Grp., Inc.*, 544 F.3d 149, 161 (2d Cir. 2008). Yet *Brady* extends only to material evidence. *Agurs*, 427 U.S. at 108. Materiality is established where "there is a reasonable probability that the suppression affected the outcome of the case, or would have put the whole case in such a different light as to undermine confidence in the verdict." *United States v. Rittweger*, 524 F.3d 171, 180 (2d Cir. 2008) (quotation marks and citations omitted); *United States v. Rivas*, 377 F.3d 195, 199-200 (2d Cir. 2004) (finding exculpatory evidence material where it "might well have been viewed by the jury as a critical piece of evidence supporting the defense theory"). For impeachment evidence, "where ample ammunition exists to attack a witness's credibility, evidence that would provide an additional basis for doing so is ordinarily deemed cumulative and hence immaterial." *United States v. Orena*, 145 F.3d 551, 559 (2d Cir. 1998).

Defendants concede that "Grant did not admit in his jail calls that he arranged Johnson's murder or that someone else, not the defendants, [was] responsible." Opening Br. 45. Moreover, given the extraordinarily attenuated and implausible nature of defendants' *Brady* claim, it is hardly clear an objectively reasonable prosecutor should have recognized the calls as having exculpatory or impeachment value. *See Leka v. Portuondo*, 257 F.3d 89, 100 (2d Cir. 2001) (citing and quoting *Spicer v. Roxbury Corr. Inst.*, 194 F.3d 547, 558 (4th Cir. 1999)). Regardless, even assuming the calls provide limited support to defendants' theory that Grant and others murdered Johnson, the jury would have been left to make a series of untenable and speculative inferences. First, the jury would have had to write off as a mere coincidence the cell site data putting Muschette near the

crime scene at the time the shooting allegedly occurred. Second, the jury would have had to discard as another coincidence that Johnson was murdered immediately after Pagett outed him as a cooperator in open court, as defendants' alternate theory operates independently of Pagett's courtroom statement. This ignores the prosecution's compelling timeline of communications between Pagett, Pagett's sister, and the defendants, which was substantiated by recordings and phone records. Third, the jury would have had to assume that the messages Grant was passing to Side Bike were in fact about murdering Johnson. And fourth, the jury would have had to speculate that the supposed feud between Grant and Pagett regarded Johnson's murder—a dubious proposition considering Pagett's cameo in the portion of Grant's rap video celebrating Johnson's murder. The calls provide no basis to conclude by a reasonable probability that the jury would have followed the defense down this winding path around the trial evidence to a different outcome.

Defendants rely heavily on *Mendez v. Artuz*, 303 F.3d 411, 413 (2d Cir. 2002), which held that the suppression of evidence that "suppli[ed] a possible alternative perpetrator *and* motive" was material. But in *Mendez*, the prosecution's case was extraordinarily weak and the *Brady* material was compelling. There, the prosecution's case turned on an eyewitness identification that was directly contradicted by other eyewitnesses. *See id.* at 414-15. "[T]wo eyewitnesses to the shooting testified at trial that they saw the shooter and that it was not [the defendant]," who also "weighed nearly fifty percent more and was approximately between six to twelve inches taller than what the eyewitnesses testified." *Id.* at 415 (emphasis omitted). "The suppressed evidence in question . . . included information that another person . . . had admitted to placing a contract on [the victim's] life prior to the shooting because he believed that [the victim] had stolen $100,000 from him." *Id.* at 412-13. Given the prosecution's weak case and the strength of the suppressed evidence, the *Brady* violation prevented the jury from "choos[ing] between . . . two competing

theories of the case." *Id.* at 414 n.1. Unlike *Mendez*, the calls in this case do not "put the whole case in such a different light as to undermine confidence in the verdict." *See Strickler*, 527 U.S. at 290. Rather, the prosecution presented compelling evidence corroborating Braithwaite's eyewitness testimony, and the alleged *Brady* material is not directly exculpatory.

For similar reasons, this case is also distinguishable from *United States v. Martinez*, 2019 WL 2582529 (E.D.N.Y. June 24, 2019), in which I recently granted a new trial under *Brady*. There, the prosecution failed to disclose that the alleged sexual assault victim suggested to a witness entirely unknown to the defendant that her relationship with the defendant was consensual. *Id.* at *4-5. The suppressed evidence went to "the core" of the victim's testimony, and the prosecutor conceded at trial that the case turned on her credibility. *Id.* at *6, 8. By contrast, defendants here knew of Grant and his possible involvement in the murder prior to trial. And the alleged *Brady* material is speculative and does not exonerate the defendants.

Recognizing that the calls prove little on their own, defendants ask me to assume that further investigation of the calls would result in additional favorable evidence. But the calls do not provide investigative leads not previously available to defendants. And a claim that evidence might produce investigative "leads," in a general sense, does not suffice to establish materiality. *See United States v. Douglas*, 525 F.3d 225, 246 (2d Cir. 2008). Before trial, as described in detail above, defendants had a basis to investigate both Grant's possible involvement in the murder and the G Stone Crips' involvement. While defendants argue that their investigation was prejudiced by the prosecution's failure to provide the calls at issue, they have now possessed the calls since February 2017 and point to no new evidence derived therefrom. Speculation that further investigation might reveal additional exculpatory evidence is insufficient to support a finding of materiality. *See Wood v. Bartholomew*, 516 U.S. 1, 6-8 (1995) (rejecting lower court's reasoning

"that the information, had it been disclosed to the defense, might have led respondent's counsel to conduct additional discovery that might have led to some additional evidence that could have been utilized").

Nor are the calls material for their impeachment value. At the outset, Grant's testimony did not inculpate defendants; he merely provided background information about the gang's knowledge of Johnson's cooperation. *See* Trial Tr. 600-666. Nevertheless, there existed "ample ammunition" to attack Grant's credibility, not least of which the rap videos discussing Johnson's murder and the album cover. *See Orena*, 145 F.3d at 559. Defense counsel had the opportunity to cross Grant about the contents of the rap videos—which they did not—as well as his animus toward Johnson, and the potential bias stemming from his cooperation agreement. *See* Trial Tr. 664-717. At best, defendants could have used the calls to probe Grant's relationship with Side Bike and why he and Pagett were upset with each other. But there is nothing to suggest that this line of questioning would have fundamentally altered the jury's assessment of Grant's credibility. *See Tankleff v. Senkowski*, 135 F.3d 235, 251 (2d Cir. 1998) ("When a witness's credibility has already been substantially called into question in the same respects by other evidence, additional impeachment evidence will generally be immaterial and will not provide the basis for a *Brady* claim."). It is more likely that Grant would have simply explained away the calls, just as he explained away a dispute between Pagett and Ramsey as "going back and forth about a girl or something." *See* Trial Tr. 660.

In conclusion, "[c]onsidering the withheld evidence in the context of the entire record, . . . [I] conclude that it is too little, too weak, or too distant from the main evidentiary points to meet *Brady*'s standards." *Turner v. United States*, 137 S. Ct. 1885, 1894 (2017). And while favorable, suppressed evidence is more likely material where the prosecution's case is weak, *see Mendez*, 303 F.3d at 415-16, here the case was compelling.

## IV. The Post-Trial Interview Notes Do Not Provide a Basis for Relief

Separately, the prosecution informed defense counsel by letter dated January 29, 2019 that counsel for Larry Pagett in another matter "believed that certain aspects of the material provided to Pagett pursuant to the Office's obligations under 18 U.S.C. § 3500 . . . may be helpful to defendants." 1/29/19 Ltr. 1, ECF No. 177-1. Defendants moved for disclosure of those documents on February 18, 2019. The prosecution agreed and produced, among other documents, interview notes dated August 10, 2017, long after defendants' trial had concluded. The witness did not testify against defendants. These notes state that Johnson's murder "may have been set up by [Grant] as punishment for giving information about [Pagett]." Disclosure 12, 22 (unfiled). In addition to these notes, defendants suggest that the other documents in the disclosure demonstrate that Grant had previously attempted to frame another gang member for a different murder and had the power to order a murder by virtue of his position in the gang. *See* Defs.' Supp. Br., ECF No. 182.

Because the documents upon which defendants rely were created after trial, *Brady* does not attach.[6] *See Dist. Attorney's Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52, 68 (2009). They are also of little value to the defense. The interview notes merely suggest that the witness believed Grant "may" have had a role in orchestrating the murder. This was nothing new, as defendants were already on notice of this possibility. In sum, the additional post-trial disclosure does not justify a new trial based on newly discovered evidence, which may be granted "only in the most extraordinary circumstances," where the defendant demonstrates, among other things, that "the new evidence would probably lead to an acquittal." *See United States v. Imran*, 964 F.2d

---

[6] One of the additional documents disclosed by the prosecution consists of notes dated October 28, 2010, which state that the cooperating witness "believe[d] [Johnson] was murdered as a result of selling drugs in a drug area belonging to someone else." Disclosure 2. For obvious reasons, defendants do not press the importance of these notes that contradict their theory of Grant's motive, nor do they argue that these particular notes should have been disclosed under *Brady*.

1313, 1318 (2d Cir. 1992) (emphasis and quotation marks omitted). Nor does it meaningfully support defendants' primary grounds for relief.

## CONCLUSION

Defendants' motion for a judgment of acquittal under Rule 29 is denied. The alternative motion for a new trial under Rule 33 is also denied.

**SO ORDERED.**

|  |  |
|---|---|
|  | *Edward R. Korman* |
| Brooklyn, New York | Edward R. Korman |
| July 25, 2019 | United States District Judge |